Filed: November 20, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-1675
(CA-00-1264-A)

Jano M. Siraj,

                              Plaintiff - Appellant,

        versus

The Hermitage in Northern Virginia,

                              Defendant - Appellee.

O R D E R

        The court amends its opinion filed November 15, 2002, as
follows:

        On page 2, opening line of text -- "PER CURIAM" is corrected
to read "BROADWATER, District Judge."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                      Clerk

UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JANO M. SIRAJ,
    *Plaintiff-Appellant,*

v.                  No. 01-1675

THE HERMITAGE IN NORTHERN
VIRGINIA,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonard D. Wexler, Senior District Judge,
sitting by designation.
(CA-00-1264-A)

Argued: April 4, 2002

Decided: November 15, 2002

Before NIEMEYER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and W. Craig BROADWATER,
United States District Judge for the
Northern District of West Virginia, sitting by designation.

---

Affirmed in part, reversed in part, and remanded by unpublished opinion. Judge Broadwater wrote the majority opinion. Senior Judge Hamilton joined and wrote a separate concurring opinion as to Part III. Judge Niemeyer wrote an opinion concurring in the judgment reached in Part III and dissenting as to Parts IV and V.

---

**COUNSEL**

**ARGUED:** Michael Patrick Deeds, KESTELL & ASSOCIATES, Falls Church, Virginia, for Appellant. David Clay Simmons, Wash-

ington, D.C., for Appellee. **ON BRIEF:** James L. Kestell, KESTELL & ASSOCIATES, Falls Church, Virginia, for Appellant. Thomas A. Cooper, KANE, JEFFRIES, GAYLE, MCGARTH & COOPER, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

BROADWATER, District Judge:

Jano M. Siraj sued her employer, The Hermitage in Northern Virginia, alleging discriminatory treatment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. The district court granted the employer's motion for judgment as a matter of law at the conclusion of the plaintiff's case, finding no evidence to support Siraj's claim of race discrimination or national origin. We affirm in part, reverse in part, and remand.

### I.

Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering the merits of a motion for judgment as a matter of law, the district court "should review all of the evidence in the record," but "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). All evidence in the record that the jury is not required to believe must be disregarded. *Id.* at 151. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted). We review a district court's granting of a motion for

2

judgment as a matter of law *de novo*. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001).

## II.

The following facts are presented in accordance with the manner in which, as set forth above, our court is required to view the evidence in this case.

### A. *Siraj's Background*

Siraj was born and raised in Ethiopia from where she immigrated to the United States in 1979. She is black and holds a bachelor's degree in finance from Long Island University.

For a little more than six years, VUMH employed Siraj at its nursing home facility known as "The Hermitage in Northern Virginia" (the Nursing Home).[1] From June 19, 1990, until her discharge on September 25, 1996, Siraj held the position of Personnel Coordinator at the Nursing Home. In this position, Siraj was responsible for all personnel functions at the Nursing Home with respect to the Nursing Home's approximately 250 employees. Siraj's specific duties included processing payroll, maintaining personnel files, coordinating health insurance benefits, and coordinating retirement benefits.

Siraj also held the position of Business Office Assistant at the Nursing Home from September 1992 until her discharge by Christopher Henderson (Henderson) in September 1996. In the position of Business Office Assistant, Siraj was responsible for accounts receivable, which included keeping accounting records of all the payments and entry fees of the Nursing Home's approximately 250 residents. After performing the accounts receivable function for approximately

---

[1] The Hermitage in Northern Virginia is merely a trade name for VUMH. As such the Hermitage in Northern Virginia is not a separate legal entity capable of being sued. *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 634 (4th Cir. 2002) (a trade name "is not a separate legal entity capable of being sued"). Thus, for purposes of this separate opinion, VUMH, as the real party in interest, will be treated as the proper defendant/appellee.

two months, Siraj received a $2,392 per annum raise to compensate her for the additional responsibility. She also received a $1,040 per annum raise two months later. Thus, by November 1992, Siraj's annual pay was $25,480.[2]

Siraj consistently received above average performance evaluations and coinciding pay raises during her employment at the Nursing Home. Notably, just three months prior to the time Henderson terminated Siraj, he gave her a $1,040 per annum raise; this was the same amount of raise that he had given her the year before. In the most recent of Siraj's annual performance evaluations (for the period June 1, 1994 to May 31, 1995), Henderson rated the quality of Siraj's work "very high, accuracy and thoroughness beyond ordinary job requirements." (J.A. 270). He also rated her as "extremely dependable in all respects" as far as being able to carry out instructions, fulfill responsibilities, and follow established procedures and policies. (J.A. 273). In all other categories of performance, including "Cooperation," and "Job Knowledge," Henderson rated Siraj as either meeting or exceeding expectations. (J.A. 271). Henderson also handwrote on the performance evaluation that Siraj "is very conscientious about her work . . .[,] has many demanding peak points[,] and she handles them all very well."[3] (J.A. 270). With the exception of the incident in September 1996, involving the two personnel files for Maintenance Department employees that Siraj provided for the inspection by Virginia's Department of Social Services (the Social Services Department), Henderson never once complained to Siraj about any problems concerning her performance.

---

[2] Prior to Siraj performing the accounts receivable function, that function was performed by Toni Ostrowski (Ostrowski), the Nursing Home's Business Office Manager. Ostrowski left her position at the Nursing Home in September 1992 and was soon replaced by the woman who had been her assistant, Linda Mendoza (Mendoza). Thus, even though Mendoza replaced Ostrowski as Business Office Manager, Siraj rather than Mendoza performed the accounts receivable function beginning in September 1992.

[3] Henderson was not the person who hired Siraj in 1990. Rather, Henderson's predecessor, Ed Burch (Burch), hired her. Henderson became the Administrator of the Nursing Home in January 1994. Prior to this time, Henderson had served as Assistant Administrator under Burch.

B. *Mendoza Resigns in 1995 And Is Not Replaced*

In December 1995 Mendoza began a three-month leave of absence. At the end of such leave of absence, she resigned as the Nursing Home's Business Office Manager. Beginning in December 1995, Siraj was expected to perform all functions of the Business Office except the accounts payable function, which could be done in two hours per week. Thus, in addition to performing her functions as the Personnel Coordinator and performing the accounts receivable function, Siraj now became responsible for physically keeping the Nursing Home's Business Office open for residents of the Nursing Home from 8:30 a.m. until 12 noon. With respect to the residents, the Business Office operated like a bank. Thus, residents would line-up to cash checks, deposit checks, make payments, and deposit and retrieve valuables from the Nursing Home's vault. With all of the extra Business Office functions that Siraj now assumed, she worked between a fifty and sixty-hour work week, although VUMH only paid her for a forty-hour work week. Henderson assigned the accounts payable function to his white, American born administrative assistant, Joan Watkins (Watkins).[4]

In December 1995, Henderson gave Siraj a written order that Watkins' salary be raised $5,000 per annum. When shortly thereafter Siraj asked Henderson why he gave Watkins the raise, Henderson responded that he did so because Watkins had taken on the additional responsibility of accounts payable. At trial, Siraj testified, which testimony must be credited in this appeal, that the following exchange between her and Henderson then took place:

> I said, accounts payable is a very small portion of the Business Office. I am doing two big departments and it is very hard for me. Even I thought [Mendoza] was coming [back from her leave of absence] and I was patient. And even when [Mendoza] was on vacation, I have to cover her,

---

[4] At the time VUMH promoted Henderson to Administrator in January 1994, Watkins held the position of Assistant to the Nursing Home's Administrator's Assistant, Pearl Kissenger. Watkins continued in that position for a few months following Henderson's promotion until Pearl Kissenger left the employ of VUMH.

5

> two weeks, three weeks at a time and I wasn't compensated for it.
>
> So, I asked him why is this? [Watkins] is only given a little, once a week just to post these things. And how come you don't give me anything for everything that I do for two departments?
>
> He said, you are the highest paid Personnel Coordinator in the company. And then I tried to tell him, try to understand I am doing two jobs, I am doing accounts receivable, which [Ostrowski] was paid 26,000 for it, plus my own Personnel Department.
>
> And he say, I don't have, I don't have money for you.

(J.A. 136).

At the time this conversation took place, Siraj was making $28,496 per annum. The pay raise ordered for Watkins raised her to a salary of $31,720 per annum. At this time, Siraj did not complain to Henderson that his refusal to give her a raise or his decision to give Watkins a raise was motivated by race or national origin discrimination.

During this same period, Siraj repeatedly asked Henderson for overtime pay, but he refused. He also refused an alternative request by Siraj to hire an assistant to help her. Henderson told Siraj that he did not have money to hire an assistant to help her. Again, Siraj made no accusations of race or national origin discrimination.

Approximately two months after Henderson told Siraj that he did not have money to hire an assistant to help her, Henderson hired a temporary employee for between three and four months to perform the accounts payable function for which Watkins had received the $5,000 raise. When asked during her direct examination at trial whether she had asked Henderson about this new hire, Siraj responded as follows:

> Yeah. I asked him, you don't have money for me, I am suffering, you don't have money for me to hire assistant, but

you hire assistant—I mean, it is not fair, you are doing
something wrong here. And I told him, you have to either
hire somebody in the Business Office or I cannot—I mean,
I am really tired. I couldn't sleep.

I have a small child, I have to be there. Always he called
two, three, four, five times he cry on the phone. He say, all
you care about is your job, and what time are you coming
home.

And I couldn't leave the office, the work has to be done
at least daily basis.

(J.A. 140). Henderson responded that if she was not happy, she could
leave. As before, Siraj did not accuse Henderson at this time of hiring
the temporary assistant to help Watkins as opposed to her on the basis
of race or national origin discrimination.

### C. *Events Leading Up to Siraj's Discharge*

The Commonwealth of Virginia (Virginia) regulates the hiring of
personnel at elderly care facilities. As part of that regulation, Virginia
requires, prior to an elderly care facility hiring a prospective
employee, that the prospective employee must undergo a police back-
ground check and two prior employer reference checks. Virginia law
also requires a precise job description for every position filled. To
ensure compliance with these and other requirements of Virginia law,
Virginia's Department of Health and the Social Services Department
conducts various inspections of elderly care facilities in Virginia.

Department Heads at the Nursing Home bore the responsibility of
submitting the required documentation for new employees to Siraj.
Siraj, in turn, bore the responsibility for maintaining in separate per-
sonnel files the documentation that she received from the Department
Heads with respect to each new employee. If Siraj did not receive the
required documentation with respect to a new employee, she routinely
used several methods of reminding the appropriate Department Head
about the deficiency. This included sending written memoranda, con-
tacting the appropriate Department Head by telephone, and/or speak-
ing to him or her in person.

7

Sometime in 1994, James Fortmuller (Fortmuller) became the head of the Maintenance Department at the Nursing Home. Fortmuller frequently hired employees into the Maintenance Department without providing Siraj the necessary job description and paperwork regarding the police check and reference checks as required by Virginia law. Siraj regularly reminded Fortmuller both orally and in writing that he needed to submit the required paperwork for the employees in his department. In one case, Fortmuller delayed eight months in submitting the required paperwork for three employees even though Siraj sent him reminder memorandums on a monthly basis.

Frustrated by the failure of Fortmuller and other Department Heads to submit the required paperwork needed to complete the personnel files, Siraj informed Henderson at every weekly staff meeting about the failures. Siraj also stressed to Henderson in July and August 1996 of the urgent need for Department Heads to submit the required paperwork due to the upcoming annual inspection in September 1996 of the personnel files by the Social Services Department. In this regard, Siraj told Henderson: "[T]he inspection time is coming, you have to do something, you are the only one who can enforce these [D]epartment Heads to submit the missing documents. And if anything happens, I mean, I told you." (J.A. 148).

Prompted by Siraj's warnings, Henderson instructed by written memorandum all Department Heads to submit the required paperwork to Siraj in order to complete the personnel files for their respective departments. Although most Department Heads complied with the memorandum, Fortmuller did not. When Siraj so informed Henderson of this fact in mid-August 1996, Henderson just told Siraj that he "will talk to [Fortmuller] again." (J.A. 149). When Fortmuller, shortly thereafter, still had not submitted the required paperwork, Siraj told Henderson:

> I did everything I can in my power to get the information from the [D]epartment Heads. And especially from Mr. Fortmuller.
>
> [F]rom now on if anything happens in the inspection, any citation or anything, you two are responsible. I have nothing, I cannot force the Directors in the same management

8

level that I was. And you are the one, their boss and my boss, you can enforce it, but I cannot enforce it.

(J.A. 151-52).

Sometime in September 1996, the Social Services Department began its inspection of the Nursing Home. The inspectors requested that Henderson provide the personnel files on two employees from each department who were hired within the last six months to a year. (J.A. 154, 203). Henderson in turn ordered Siraj to assemble such files for inspection "right away." (J.A. 154). Siraj used her best efforts to assemble the files requested and promptly hand-delivered them to Henderson's office. The only files from the Maintenance Department that met the requested criteria were incomplete because Fortmuller had failed to provide the required paperwork. So upon delivery, Siraj warned Henderson "these are the files. But as you know, the Maintenance Department files, the two files, that you know and I know they are not complete." (J.A. 154-55). Siraj also told Henderson that the two files from the Maintenance Department were on top of the stack of files that she had hand-delivered. Additionally, Siraj left a yellow sticky note on top of the two files from the Maintenance Department indicating that they were not complete. Without further comment, Henderson told Siraj to give the entire stack of files to Watkins and leave. Siraj did as instructed.

The very day following the inspection, Henderson called Siraj into his office and told her that she should resign. When she asked him why, he responded only that "[the Social Service inspectors] found the Maintenance [Department] files weren't complete." (J.A. 156). Siraj tried in vain to remind Henderson that she had repeatedly told him about the difficulty she had experienced in getting Fortmuller to respond to her reminders to update his files. Henderson told her that he did not want to hear her excuses and insisted that she resign. When Siraj refused to resign, Henderson discharged her.

Siraj then requested that Henderson "give [her] something in writing why [he was] terminating [her]." (J.A. 158). While Siraj gathered her belongings, Henderson gave her a document entitled "EM-PLOYEE DOCUMENTATION." (J.A. 279). In pertinent part, it stated as follows: "On Wednesday, September 25, 1996, Ms. Jano

9

Siraj was terminated due to poor performance of job duties. When I discussed this with Ms. Siraj, she blamed all others except herself. This is a very common defense of Ms. Siraj's." (J.A. 279).

### D. *Post-Termination*

After her termination, Siraj filed for unemployment compensation. Initially, VUMH successfully challenged her claim on the ground of poor performance, *i.e.*, that she provided two incomplete files for the Social Services Department's 1996 inspection. However, after producing her performance evaluations showing that she was an exemplary employee and copies of the reminder memos to Fortmuller to update his files, Siraj was awarded unemployment benefits.

### E. *VUMH's Employee Handbook*

VUMH's Employee Handbook provides that there are two levels of infractions. The first level of infractions includes, *inter alia*, unsatisfactory performance of duties, unexcused absences, and violation of safety rules. The second level of infractions includes, *inter alia*, any deliberate act not in the best interest of VUMH. The first level of infractions called for a progressive system of discipline: a first offense was met with an Employee Action Report, a second offense resulted in one to thirty days probation or one to ten days suspension, and a third offense resulted in discharge. A second level infraction simply resulted in dismissal. VUMH's Handbook required that no discipline would be imposed for an infraction without an investigation by VUMH.

### III.

Addressing the merits of Siraj's retaliatory discharge claim, Title VII prohibits discrimination against any employee who "has opposed any . . . unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Title VII makes it unlawful "to discriminate against any individual with respect to his compensation . . . because of such individual's" race or national origin. 42 U.S.C. § 2000e-2(a)(1).

To prove a *prima facie* case of retaliatory discharge, Siraj must show: (1) that she engaged in protected activity; (2) that her employer

took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998).

It is undisputed that Siraj suffered an adverse employment action and therefore satisfies the second requirement of the *prima facie* case: she was terminated. *See Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action). As to the first requirement, Siraj voiced her opinion to Henderson that she was being paid less than Caucasian co-workers. Protected activities include opposition activities such as utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities. *See Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998). Therefore, Siraj has also met the first requirement because her remarks to Henderson were protected opposition activities.

However, Siraj failed to establish the third requirement of a *prima facie* case of retaliatory discharge. She provided no casual connection between her termination and her complaints concerning disparity in pay. Siraj testified that she was terminated due to the problem with the deficient personnel files not because of the opinions she expressed to Henderson. Thus, the district court was correct in holding, as a matter of law, that Siraj failed to make a *prima facie* case of retaliatory discharge.

IV.

Turning to Siraj's discriminatory discharge claim, Title VII prohibits an employer from, *inter alia*, discharging an employee because of such employee's race or national origin. 42 U.S.C. § 2000e-2(a)(1). Siraj sought to prove that VUMH discharged her because of her race and national origin in violation of Title VII under the familiar *McDonnell Douglas* burden-shifting proof scheme. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that proof scheme, Siraj initially had the burden of establishing a *prima facie* case of discriminatory discharge. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). To prove a *prima facie* case of discriminatory discharge, Siraj must show that: (1) she is a member of a pro-

tected class; (2) she was qualified for her job and her job performance was satisfactory; (3) that, in spite of her qualifications and satisfactory performance, she was discharged; and (4) that the position remained open to similarly qualified applicants after her dismissal or was filled by a member outside the protected class. *Reeves*, 530 U.S. at 142; *Karpel v. Iova Health System Services*, 134 F.3d 1222, 1228 (4th Cir. 1998). Once Siraj establishes the elements of her *prima facie* case, the burden shifts to VUMH to proffer evidence of a legitimate, non-discriminatory reason for her discharge. *Reeves*, 530 U.S. at 142. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Id.* (internal quotation marks omitted).

Once VUMH meets its burden of production, the *McDonnell Douglas* framework, with its presumptions and burdens, disappears, and the sole remaining issue is discrimination *vel non*. *Reeves*, 530 U.S. at 142-43. Significantly, under *Reeves*, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. This is because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147. The examples that the Supreme Court gave to illustrate when such a showing is insufficient to get the plaintiff's Title VII claim to the jury is where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148. Applying this burden-shifting proof scheme to the evidence as our court is required to view it (in the light most favorable to Siraj and disregarding all evidence the jury is not required to believe) leads to the conclusion that the district court erred by granting VUMH's motion for judgment as a matter of law with respect to Siraj's discriminatory discharge claim based upon race and national origin.

Siraj presented sufficient evidence to establish a *prima facie* case of discriminatory discharge based on her race and national origin. First, there is no dispute that, as a black person of Ethiopian national

12

origin, Siraj is a member of two protected classes. Thus, she meets the first element of a *prima facie* case of discriminatory discharge. Second, from her consistently overall above average performance evaluations (including some very complimentary statements about the quality of her work) and the not insubstantial pay raise that she received a mere three months before her discharge, a reasonable jury could find that Siraj established the second element of a *prima facie* case of discriminatory discharge, *i.e.*, that at the time of Siraj's discharge she was qualified and her job performance was satisfactory. Therefore, we conclude that Siraj presented sufficient evidence for a reasonable jury to believe that she performed satisfactorily with regard to these two files.

Siraj's story, which we must credit for purposes of this appeal, is that: (1) she used every avenue available to her, including enlisting the direct and willing aid of Henderson as Fortmuller's boss, to prompt Fortmuller to provide her with the required paperwork to complete the personnel files for the Maintenance Department; (2) because all of the Maintenance Department personnel files for employees hired within six months to a year preceding the inspection were incomplete on account of Fortmuller, she had no choice but to select incomplete Maintenance Department files in connection with the inspection; and (3) she verbally and in writing (*i.e.*, with the yellow sticky note) warned Henderson at the time she delivered the files for inspection that the two Maintenance Department personnel files were incomplete, due to Fortmuller's omission. This gave Henderson one last opportunity to obtain the missing paperwork from Fortmuller before he turned the stack of files over to the Social Services Department for inspection. There is no evidence in the record that the jury would be required to believe to support a finding that VUMH expected Siraj to act differently than she did in connection with the incomplete Maintenance Department files.

There is no dispute that because VUMH discharged Siraj, she has met the third element of a *prima facie* case of discriminatory discharge. Fourth and finally, the evidence establishes that Watkins (white and American born) replaced Siraj as Personnel Coordinator immediately after VUMH discharged Siraj and that Watkins served in that position for at least one year.

13

At this point, the burden shifts to VUMH to proffer a legitimate, nondiscriminatory reason for Siraj's discharge. Although the district court dismissed this case prior to requiring VUMH to meet its burden of production in this regard, throughout this litigation, VUMH has maintained that it discharged Siraj because she deliberately sought to sabotage its performance in the Social Services Department's 1996 inspection by choosing incomplete files for the inspectors to review.[5] For purposes of appellate review, VUMH has met its burden of production.

With VUMH having met its burden of production, the *McDonnell Douglas* framework, with its presumptions and burdens, disappears, and the sole remaining issue is discrimination *vel non*. *Reeves*, 530 U.S. at 142-43. The record reveals that Siraj made a substantial showing that VUMH's proffered reason for discharging her was false. First, the record shows that in the months and weeks leading up to the Social Services Department's 1996 inspection, Siraj did everything in her power, including enlisting the direct aid of Henderson as Fortmuller's boss, to compel Fortmuller to turn over the required paperwork to complete the personnel files for the Maintenance Department before the inspection. For example, Siraj regularly reminded Fortmuller of the deficiencies in the files for the Maintenance Department, both orally and in writing. Siraj also diligently informed Henderson at every weekly staff meeting about the same deficiencies and the urgency to correct them due to the upcoming inspection. Henderson acknowledged that Siraj was powerless to force Fortmuller and the other department heads to submit the required paperwork when he instructed them to do so by written memorandum. Moreover, when Siraj informed Henderson in mid-August 1996 that Fortmuller had not complied with Henderson's written memorandum, Henderson told Siraj that he would talk to Fortmuller again. When viewed in the light most favorable to Siraj, this evidence clearly shows that far from harboring an intent to sabotage VUMH in the Social Services Department's 1996 inspection, Siraj went to great lengths to insure that VUMH performed well in the inspection with respect to the personnel files.

_____

[5] In its appellate brief, VUMH seems to suggest that Siraj intended to deliberately harm VUMH because she was a disgruntled employee.

14

Second, the evidence, viewed in the light most favorable to Siraj, shows that Siraj used her best efforts to select the most complete files for the inspection. Through no fault of her own, she had only incomplete files to choose from with respect to the Maintenance Department. This is in direct conflict with VUMH's proffered sabotage theory.

Third, and also in direct conflict with VUMH's proffered sabotage theory, is the fact that when Siraj hand-delivered the stack of files for the inspection to Henderson, she expressly warned Henderson that the two files from the Maintenance Department were incomplete, even going so far as to flag those files as incomplete with a sticky note. If Siraj had truly intended to sabotage VUMH's performance in the inspection, she would not have taken these actions.

Fourth, the fact that VUMH shifted its stated reason for discharging Siraj over time is further proof that VUMH's proffered reason for Siraj's discharge is unworthy of credence. *EEOC v. Sears*, 243 F.3d 846, 852-53 (4th Cir. 2001) (employer's shifting reasons for adverse employment action is, in and of itself, probative of pretext). When Siraj asked Henderson at the time of her discharge to tell her the reason why he decided to discharge her, Henderson only told Siraj that it was because "[the Social Service inspectors] found the maintenance files weren't complete." (J.A. 156). Not a single word was uttered to the effect that Siraj deliberately selected incomplete files from the Maintenance Department in an effort to sabotage VUMH's performance in the inspection. Similarly, in a document entitled "EMPLOYEE DOCUMENTATION" and given to Siraj on the day of her discharge, Henderson stated that Siraj was being discharged "due to poor performance of job duties." (J.A. 279). Again, no mention of sabotage.

While a reasonable jury, viewing the evidence in the light most favorable to VUMH, could find that sabotage is encompassed by the term "poor performance," and thus, VUMH has not really shifted its reason over time for discharging Siraj; such a view of the evidence is impermissible on our review from the district court's grant of judgment as a matter of law. As stated previously, we are required to view the evidence in the light most favorable to Siraj. So viewing shows that a reasonable jury could find that when Henderson gave poor per-

15

formance as the reason for discharging Siraj on the day of her discharge, he meant that she was negligent in maintaining the personnel files and negligent in selecting the personnel files for the inspection. This means that the reason VUMH now proffers as its legitimate non-discriminatory reason for discharging Siraj, *i.e.*, sabotage, is a significant change from the reason Siraj was given at the time of her discharge. The reason given at the time of her discharge rests on unintentional carelessness, while, in contrast, the reason proffered by VUMH throughout this litigation rests upon deliberate acts taken with the intent to harm. *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext . . . .").

Henderson knew that Siraj had done everything in her power to insure the completeness of all personnel files before the inspection. He also knew that VUMH's Employee Handbook required progressive levels of discipline before an employee could be discharged for poor performance. However, the Employee Handbook did not require progressive levels of discipline for a deliberate act by an employee who intended to harm VUMH. Thus, a reasonable jury could expect that at the time of Siraj's discharge Henderson would have given sabotage as the reason for her discharge, if it was the actual reason. The evidence just outlined is more than sufficient for a reasonable jury to find that VUMH's proffered reason for discharging Siraj is not true.

This is a situation where the plaintiff's *prima facie* case, combined with the above outlined evidence which is sufficient for a reasonable jury to find that the employer's proffered reason is false, permits the trier of fact to infer that VUMH discharged Siraj in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1). Furthermore, this is certainly not the type of case suggested by *Reeves* in which "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. The record in this case does not conclusively reveal some other, nondiscriminatory reason for VUMH's decision to discharge Siraj. This is also not a case where the plaintiff only created a weak issue of fact as to whether VUMH's proffered reason was false and the record contained abundant and uncontroverted independent evidence that no discrimination has occurred. *Id.* Thus, there was sufficient evidence with respect to Siraj's discriminatory discharge claim,

16

and therefore, the district court improperly granted judgment as a matter of law.

V.

Siraj's final claim is that she established a *prima facie* case of wage discrimination. In order to make out a *prima facie* case of wage discrimination, the plaintiff must show: (1) that she is a member of a protected class and (2) that the job she occupied was similar to higher paying jobs occupied by employees outside the protected class. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994). Once a prima facia case has been established, the burden then shifts to the employer to articulate a legitimate reason for the pay disparity. *See id.*

As a black Ethiopian female, Siraj is clearly a member of a protected class. Thus, she has clearly established the first element of a wage discrimination claim. Siraj also established that the job she occupied was similar to the position held by Watkins and that she was paid less than Watkins. Under *Marist College*, two parties are similarly situated if their job requirements are similar in the level of competency, education, and requirements. *See McEleney v. Marist College*, 239 F.3d 476 (2nd Cir. 2001). Siraj offered ample evidence that her job required at least equal skill, effort and responsibility as Watkins' job. Therefore, the burden shifted to VUMH to articulate a legitimate reason for the pay disparity. Because no reason was articulated by VUMH, the district court improperly granted judgment as a matter of law on Siraj's wage discrimination claim. Accordingly, we must remand this issue to the district court.

VI.

In sum, we affirm the district court's granting of VUMH's motion for judgment as a matter of law as to Siraj's claim of retaliatory discharge. We reverse the district court's dismissal of Siraj's claims of racial discrimination or national origin and wage discrimination. We remand these issues to the district court.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

17

HAMILTON, Senior Circuit Judge, concurring in part and concurring in judgment:

I concur in all parts of Judge Broadwater's opinion with the exception of Part III, which addresses Siraj's retaliatory discharge claim. While I agree with the opinion's affirmance of that claim, I would affirm on the ground that Siraj's discharge did not follow any activity on her part protected by Title VII.

## I.

Siraj's retaliatory discharge claim fails because she cannot establish that she engaged in protected activity under Title VII. *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 180 (4th Cir. 1998) ("In order to prove retaliation [,] a plaintiff must show that he engaged in protected activity, that his employer took adverse employment action against him, and that the employer did so because of the protected activity."). Siraj's retaliatory discharge claim rests on her allegation that VUMH unlawfully discharged her because she complained to Henderson about the pay disparity between her and Watkins. However, the uncontradicted evidence, supplied primarily through the testimony of Siraj herself, shows that Siraj never complained to Henderson or even suggested to Henderson that the pay disparity between herself and Watkins resulted from race or national origin discrimination. Rather, the undisputed evidence in the record shows that Siraj only complained to Henderson in general that she was being paid less than Watkins, who Siraj asserted at the time had a less demanding job. In short, there is no evidence that Siraj expressed opposition to the pay disparity on the basis that it resulted from race or national origin discrimination. Thus, she did not engage in protected activity under Title VII before her discharge. For this reason, her retaliation claim fails. *Winchester v. Galveston Yacht Basin*, 943 F. Supp. 776, 781-82 (S.D. Tex. 1996) (female employee failed to establish that she was engaged in protected activity when she complained about allegedly being compensated at lower rate than other male managers, where there was no evidence that her complaint was related to her gender), *aff'd by*, 119 F.3d 1 (5th Cir. 1997) (unpublished) (no discussion).

18

## II.

In conclusion, I concur in all parts of Judge Broadwater's opinion with the exception of Part III. While I agree with the opinion's affirmance of Siraj's retaliatory discharge claim, I would affirm that claim on the ground that Siraj's discharge did not follow any activity on her part protected by Title VII. Accordingly, with respect to Siraj's retaliatory discharge claim, I concur only in the court's judgment.

NIEMEYER, Circuit Judge, concurring in part in the judgment and dissenting in part:

Because I would affirm entirely the judgment of the district court for the reasons given by the court, I concur in the judgment reached in Part III of the majority opinion and dissent from Parts IV and V.

As Personnel Coordinator and Business Office Assistant at the Hermitage, a nursing home in Northern Virginia, Jano Siraj was required to keep personnel files up to date and in compliance with Virginia State regulations. When Social Services inspectors arrived at the Hermitage in September 1996 to conduct their annual inspection, they requested the personnel files of two new hires from each department. Siraj produced several incomplete files, together with her yellow "post-it" note on the files' covers indicating that the files were incomplete, which substantially embarrassed the Hermitage and led to the inspectors' conclusion that the Hermitage's files were out of compliance. After the inspectors left, the administrator of the nursing home asked Siraj to resign, and when she refused to resign and tried to blame others, accepting no responsibility for the failures, the administrator discharged her.

Siraj thereafter contended that the facility should have used progressive discipline, as was its policy. She also contended that, in firing her, the Hermitage discriminated against her based on her race and national origin — black and Ethiopian.

After Siraj presented her evidence at trial, the district court granted the defendant's motion for judgment as a matter of law. The court explained:

19

> I find there is no evidence whatsoever for any jury to believe there was race discrimination or national origin [discrimination]. There is no testimony whatsoever of any racial or national origin discrimination.
>
> The only testimony is she was treated differently than a Ms. Watkins, who was white. But under the law, she had a different job. They were not related, the same job, as the Fourth Circuit has said. And even the Second Circuit, which relied upon the Fourth Circuit in *Barbara Levin McLenney, M-c-L-e-n-n-e-y, versus Marist College*, decided on February 2001 citing the Fourth Circuit, that you cannot rely upon discrimination of a particular party if the jobs are not related. And they were not related.
>
> And what they did with one has nothing to do with what they did here. There is just no evidence of intentional discrimination of any kind. None was said.
>
> In fact, the plaintiff twice in her direct said she was not angry with anyone from top to bottom. In fact, she said when she got fired, she thought they were playing a joke on her, things were so great.
>
> Where is there discrimination? Up until the last moment, everything was great.

(J.A. 262-63.)

Because the record supports the district court's conclusions, I would affirm for the reasons given by the court. Accordingly, I concur in the conclusion that no claim of retaliatory discharge was proved and I respectfully dissent from those portions of the opinion that reverse the judgment of the district court.

20