David **EADY**, Plaintiff,

v.

**VEOLIA TRANSPORTATION SERVICES, INC.,** Defendant.

**Civil Action No. 2:06–3413–CWH.**

United States District Court, D. South Carolina, Charleston Division.

March 31, 2009.

Robert A. Kerr, Jr., Wendy L. Wilkie, Hagood and Kerr, Mt. Pleasant, SC, for Plaintiff.

Brian C. Hey, James N. Foster, Jr., Robert D. Younger, McMahon Berger Hanna Liniham Cody and McCarthy, St. Louis, MO, John H. Tiller, Haynsworth Sinkler Boyd, Charleston, SC, for Defendant.

## ORDER

C. WESTON HOUCK, District Judge.

The plaintiff, David Eady (the "plaintiff" or "Eady"), filed this action against his former employer, Veolia Transportation Services (the "defendant"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, discrimination under the Family Medical Leave Act of 1993 ("FMLA"), as amended, 29 U.S.C. §§ 2601–2654, and wrongful termination and breach of contract in violation of state law.[1] This matter is before the Court on the defendant's motion for summary judgment.

**1.** The plaintiff also had included in his complaint a claim for age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), 29 U.S.C. §§ 621–634. By brief, the plaintiff has withdrawn this cause of action. (*See* Pl. Amended Response 1).

**2.** By way of background, in September 1996, SCE & G's responsibility for providing bus service to the City ended and the City became financially responsible for providing bus service, Thereafter, the City contracted with SCE & G to run the bus service on its behalf. In 1997, the City established the Charleston Area Regional Transit Authority ("CARTA"), which became financially responsible for providing bus service to the City. Initially, CARTA continued to contract with SCE & G to operate the bus service on its behalf, but during 1997, CARTA sought bids on the bus system contract. In 1998, ATC/Vancom of South Car-

## I. The Plaintiffs Allegations

The facts are viewed in a light most favorable to the plaintiff as the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Eady, an African–American male, began employment as a bus driver in 1979 with South Carolina Electric & Gas Co. ("SCE & G"), which provided bus service to the City of Charleston (the "City"). Eady remained a bus driver until about 1986, when he was promoted to the supervisory position of Relief Dispatcher. He held that position until 1997, when he was promoted to the position of Chief Dispatcher.[2] On January 1, 1999, the plaintiff became a Lead Transportation Supervisor and reported directly to the Operations Manager. In November 1999, Virginia Stevens, a Caucasian female, became ATC's General Manager of the Charleston facility. At that time, Stevens promoted the plaintiff to Operations Manager. As Operations Manager, Eady supervised all operations and administrative personnel and worked under the general direction of Stevens, the General Manager.[3]

olina, L.P. ("ATC"), a privately held company, was awarded the contract to provide bus service in the City on behalf of CARTA and on January 1, 1999, ATC began providing bus service to the City pursuant to its contract with CARTA. In December 1999, National Express Corporation ("NEC"), a Delaware corporation with its principal place of business in Austin, Texas, purchased and became the parent corporation of ATC. In September 2005, Veolia Transportation Services, Inc. ("Veolia") purchased the stock of ATC from NEC. Veolia continues to provide public fixed route transportation services to the City of Charleston through its contract with CARTA. (Joint Factual Brief ("JFB") (Docket # 56) ¶¶ 3–13).

**3.** *See* JFB ¶ 33 *and* Operations Manager job description, Joint Exhibit 1 (Docket # 56). In the Joint Factual Brief filed with the Court,

In November 2004, Charleston County voters passed a referendum for a sales tax increase, which, among other things, provided CARTA with additional funding for the bus system. Accordingly, CARTA and ATC began plans to increase the number of bus routes and employees in June 2005. (JFB ¶¶ 73–74).

In December 2004, Stevens met with Eady for his annual review, and discussed the "Action Steps" that she had created in November 2004 in anticipation of the June 2005 start-up. The "Action Steps" she assigned Eady were designed to make the Operations Department better and ensure a successful start-up in June 2005. The "Action Steps" assigned to Eady were legitimate duties and responsibilities of the Operations Manager. (Stevens Aff. ¶¶ 15–17).

Eady admits that Stevens told him during his December 2004 review that she was not satisfied with various aspects of his job performance. The relevant deposition testimony is as follows:

Q: Did you understand these to be your goals and action steps, in December of '04, when this review was given to you or was this someone else's?

A: I understand this to be some of the things I need to improve on, correct.

(Joint Exhibit ("Jt. Ex.") 2, Eady Dep. 50–51; 54–58).

As a result of funding from the November 2004 referendum, sometime in March 2005, CARTA and ATC began plans to reinstate approximately ten bus routes in June 2005, which would require the reinstatement and hiring of approximately 80–85 employees to service these additional routes. (JFB ¶ 75). At about that time, ATC's corporate office sent Ms. Leslie Systma to the Charleston facility to assist with the June 2005 start-up. Systma had experience with assisting other ATC facilities with start-ups. Also in March 2005, Systma created a CARTA Project List, based on other start-ups she had done, containing "Action Items" for each employee, including Eady, to accomplish prior to and as part of the June 2005 start-up. The CARTA Project List, including "Action Items" for Eady to complete, was distributed to Eady, as well as to other employees, in early March 2005.[4] (Stevens Aff. ¶¶ 18–21).

The parties agree that as Operations Manager, Eady was assigned certain responsibilities as part of the June 2005 start-up, and that these responsibilities included, but were not limited to: (1) recalling of prior employees, and interviewing, hiring, and training of new employees; (2) establishing a schedule for each existing and proposed new routes; (3) establishing staff support and testing the existing seven routes and as well as the ten additional routes to be added in June 2005; (4) securing the old Naval Base as a site to conduct training; and (5) developing a written plan on how to train all new employees. Although other employees were to assist Eady in developing a written training plan, Eady was assigned the task to make sure

---

the parties variously refer to the plaintiff's job title as Operations Manager, Director of Operations, and Operations Director. *See, e.g.,* JFB ¶¶ 20, 33, 76, Joint Exhibit 7 (Operations Manager) JFB ¶¶ 80, 83, 84 (Director of Operations), and JFB ¶ 92 (Operations Director). It is understood by the Court that these job titles are interchangeable, and all refer to the plaintiff's job title.

4. A true and exact copy of the CARTA Project List, updated April 26, 2005, is attached to Stevens' Affidavit as Exhibit I. According to Stevens, most, if not all, of the "Action Items" included in Exhibit I were assigned to employees, including Eady, in early March 2005. (Stevens Aff. ¶¶ 22–23).

the written training plan was completed. (JFB ¶ 76).

In April 2005, Stevens showed Eady an organizational chart that proposed a change in the plaintiffs job title from Director of Operations ·to Assistant General Manager/Director of Operations. That same organizational chart also proposed that the job title of David Bonner, a Caucasian, would change from Director of Maintenance to Assistant General Manager /Director of Maintenance.[5] (JFB ¶ 80; Jt. Ex. 3; Stevens Aff. ¶¶ 26–27; Eady Dep. 79–80; Eady Aff. ¶ 27). According to Stevens, both Eady and Bonner met with her at the same time. During this meeting, Stevens did not tell Eady and Bonner they were going to receive additional duties, responsibilities, or money, and she did not tell Eady or Bonner they. were being promoted. (Stevens Aff. ¶ 28). The plaintiff admits that he was never told that he would receive additional duties, responsibilities, or money as a result of his title being changed from Director of Operations to Assistant General Manager/Director of Operations. (Eady Dep. 70). The plaintiff, however, considered this proposed change in job title as a promotion, The plaintiff stated in his February 2008 affidavit: "Ms, Stevens told me [in April 2005] that I would be promoted to Assistant General Manager ("AGM"). She told me that I deserved the promotion, Ms. Stevens also said that Mr. Bonner would ,be promoted to AGM. From the previous AGM, I knew that I would act as the General Manager while the General Manager was away from the office." (Eady Aff. ¶ 9).

Bonner testified that when he became Assistant General Manager, he was told he was receiving a title which would allow him to be responsive to CARTA if the General Manager were absent. (Bonner Dep. 17 (Docket # 52–5)). The plaintiff admits that when Bonner's title changed from Director of Maintenance to Assistant General Manager/Director of Maintenance, Bonner did not receive a salary increase. (JFB ¶¶ 44–45).

At some time in April 2005, the plaintiff was injured in a car accident. Me took FMLA leave from April 29 to May 23, 2005, when he returned to work. (JFB ¶¶ 81–82). Stevens testified that on May 26, 2005, the final version of the organizational chart was posted in the facility. Stevens had not changed Eady's title from Director of Operations to AGM/Director of Operations because she had discovered issues with Eady's performance when he was out on FMLA leave in May 2005. (Stevens Aft. ¶ 38). Eady's performance issues caused Stevens concern about identifying Eady as the Assistant General Manager to ATC's only customer, CARTA. (Stevens Dep. 117–118; Stevens Aff. ¶ 36).

Also on May 26, 2005, the plaintiff saw the final version of the organizational chart and learned that his title had not been changed from Director of Operations to AGM/Director of Operations. The plaintiff noticed that Bonner's title had been changed to AGM/Director of Maintenance. (JFB ¶ 83). The only difference between the April 2005 proposed organizational chart and the final version of the organizational chart posted on May 26, 2005 was that Eady did not have the title of Assistant General Manager/Director of Operations under his name. (Stevens Aff. ¶ 39; Eady Dep. 98). The organizational chart did not change the position of the plaintiff in the organizational hierarchy. (Eady Dep. 98).

---

5. Bonner had been employed by ATC as the Director of Maintenance since November 1999. (JFB ¶ 43).

The plaintiff testified at his deposition that he was not upset about not being given the title of Assistant General Manager; he was upset that Stevens had not discussed it with him first:

Q: Did it upset you that you were not given the AGM position?

A: No. No, it didn't upset me that I was not given the AGM position. It upsetted [sic] me about not being told and not explaining the process. I mean, she can make she can make a driver AGM, that wouldn't make any difference to me, but explain the process to me and tell me how it works and sit down, at least give me that respect, and not—you know, and tell me this is the reason.

(Eady Dep. 108–109; Eady Aff. ¶ 14).

The plaintiff spoke with Stevens about the reason his title was not changed from Director of Operations to AGM/Director of Operations. The plaintiff contends that Stevens first claimed that it was because he had returned to work on a part-time basis after his FMLA leave. (Eady Dep. 99–100; Eady Aff. ¶ 15). However, Eady also said that Stevens told him she was not going to change his title from Director of Operations to AGM/Director of Operations because she was not satisfied with his job performance. (JFB ¶ 84; Eady Dep. 104–107, Stevens Aff. ¶ 43).

On May 26, 2005, Stevens began counseling Eady with respect to his failure to adequately perform the duties and responsibilities of Operations Manager. (Stevens Aff. ¶ 42). Stevens claims that she did not document Eady's poor performance in May 2005 because she was in the middle of two union negotiations concerning over one hundred employees, and there was less than a week before ten new routes would become active. (Stevens Aff. ¶ 44).

In June 2005, ten new bus routes became active. The parties agree that as Operations Manager, Eady's responsibilities for the June 2005 start-up included, but were not limited to the following: (1) recalling prior employees, and interviewing, hiring, and training new employees; (2) establishing a schedule for each existing and proposed new route; (3) establishing staff support and testing the existing seven routes and as well as the additional ten routes added in June 2005; (4) securing the old Navy Base as a site to conduct training; and (5) developing a written plan on how to train all new employees. Although other employees were to assist Eady in developing a written training plan, the task was assigned to Eady to make sure the written training plan was completed. (JFB ¶ 76).

After the first start-up in June 2005 was completed, the defendant immediately began to initiate the second phase of reinstatement, wherein nine new routes were scheduled to open in January 2006. The defendant needed to hire 20–25 new drivers and two new supervisors prior to the second start-up, in January 2006. The parties agree that prior to this second start-up in January 2006, Eady's responsibilities included, but were not limited to: (1) recalling former employees and interviewing and hiring prospective employees; (2) hiring two additional supervisors; and (3) testing the January 2006 proposed routes by establishing a schedule for each route to make sure the routes worked in terms of path, traffic, and timing. (JFB ¶ 89).

On June 2, 2005, Howard Chapman, the Executive Director of CARTA, complained to Stevens about Eady's job performance, (Stevens Aff. ¶ 45). Stevens made a "note to file" which stated:

Howard Chapman called and said he was not pleased with David Eady. He said they had asked [Eady] to proof the schedules and he agreed to look at them. He said he sent them back and said they looked fine. Howard said he looked at

them for 15 minutes and found numerous errors including one schedule that was completely wrong. He said to make sure I told him [h]e was not happy with him.

(Jt. Ex. 5).

Later in June 2005, after the substantial completion of the first start-up, Stevens still had concerns about Eady's performance. In her opinion, Eady was angry, uncooperative, and generally was not working well with other departments. During June 2005, she talked to Eady regarding his performance as well as his department's performance. Stevens told him she was not happy with his supervisors' performance and told him he and his department needed to get back on track to ensure a better start-up for January 2006. Stevens believed that the June 2005 start-up was not as smooth as it could have been. (Stevens Aff. ¶¶ 46–47).

Stevens was unsure what to do about Eady's poor performance, so she called Bill McCloud, Senior Vice–President of ATC and told him she had concerns about Eady's performance. McCloud suggested Eady be placed on some type of improvement plan. In an effort to get Eady and his department back on track, as well as ensure a smoother start-up in January 2006, Stevens contacted Eric Systma, ATC's Human Resource Director, to assist her in creating a 90 day Performance Improvement Plan ("PIP") for Eady. (Stevens Aff. ¶¶ 48–50).

On August 8, 2005, Stevens gave several employees a bonus based on their hard work during the June 2005 start-up. The bonuses were not based on personal performance, but rather on the extra amounts of time they worked before the June 2005 start-up. (Stevens Aff. ¶ 51). Eady re-

ceived a bonus of $800.00. (Jt. Ex. 6). Four other employees received bonuses at that time.[6]

On August 30, 2005, Stevens met with Eady for an hour to discuss his job performance. During this meeting, Stevens presented Eady a 90 day Performance Improvement Plan ("PIP"). (Jt. Ex. 8; JFB ¶¶ 93–94; Stevens Aff. ¶ 53). The PIP listed a number of specific actions, and was accompanied by a letter from Stevens to the plaintiff which stated:

> Dear David,
>
> You and I have met and discussed your job performance in your review in January 2005. In June 2005 during start-up we discussed the fact that the Operations Department performance was still unacceptable. Since that time I have seen very little or no improvement. Responsibility falls directly under your supervision and it is imperative that we see improvements within the next 90 days. In an effort to assist you in meeting the improvements required I have included a 90 day action plan of improvement. I have attached an outline of specific problems that need to be addressed and fall directly within your supervision. All of the items listed are specific problems that we have talked about. You must take a proactive role in managing the day to day operations of the department. You must also work on your communication with other departments to insure smooth daily operations. The lack of organization, planning and communications is affecting all departments, and I must hold you accountable for the performance. I will be meeting with you

---

6. The other employees who received bonuses were

| | |
|---|---|
| David Bonner | $1,500.00 |
| Kristen Fletcher | $1,100.00 |
| Harry Burnell | $1,000.00 |
| Karen Hardwick | $ 600.00. |

(JFB ¶ 90; Jt. Ex. 7).

monthly to discuss with you the progress you are making on this action plan.

We have moved Customer Service and Safety out from under your direct supervision to allow you the ability to focus on Operations . . .

In June 2005 you assisted with start-up and we are appreciative of the efforts that were made in making that successful. The start-up did no go as smoothly as it should have, but we can learn from the mistakes and prepare for the fall start-up. You must now focus on your department and get it organized and running effectively and efficiently. We have drifted along for too long in the day to day operations and must act now in making the department run properly before the start-up of additional services in January 2006.

I have tried unsuccessfully to impress upon you the importance of getting your department on track. I regret that this action is necessary, but if we do not see improvements then further actions will need to be taken up to and including termination of employment with ATC.

(Jt. Ex. 8).

In August or September 2005, Bonner announced that he was leaving ATC to take another job. After Bonner left the defendant's employment, Stevens did not change Eady's title from Director of Operations to AGM/Director of Operations. (JFB ¶¶ 91–92; Stevens Aft. ¶ 55). Since September 2005, no one has held the job title of Assistant General Manager at the defendant's Charleston facility. (Stevens Aff. ¶ 56).

The parties agree that as part of Eady's duties as Director of Operations, he was responsible for ensuring that all bus accidents were properly investigated. On September 8, 2005, Kristen Fletcher sent Eady and all supervisors a memorandum addressing the defendant's accident procedures.[7] (JFB ¶ 97; Jt. Ex. 10).

Approximately one month later, on October 4, 2005, Stevens met with Eady to discuss his 90 day PIP. Eady showed Stevens a chart he had created to track his progress in each of the areas identified by the PIP. (JFB ¶ 95; Jt. Ex. 9). Stevens recalled that during that meeting, Eady told her he hated his job and would consider doing another job. (Jt. Ex. 11).

Important union negotiations involving Eady's Operations Department were scheduled for the week of October 10, 2005. During a staff meeting on October 7, 2005, Stevens told Eady she would appreciate it if he would hold off on vacation time because she needed him during union negotiations. She also told Eady she needed him on October 10, 2005 for the beginning of a new service starting at the Medical University of South Carolina ("MUSC"). Stevens believed that the MUSC service was very important to the facility and to CARTA, and she wanted to ensure it would run smoothly. According to Stevens, Eady took his vacation from the afternoon of October 10, 2005 to the end of the week. Eady did not attend any union negotiations that week. Stevens believed that Eady displayed a poor attitude by taking his vacation during a time of the year when she and the defendant needed him. (Stevens Aff. ¶¶ 58–60).

On October 20, 2005, Fletcher sent Eady and all supervisors a second memorandum that outlined the procedures and responsibilities regarding the documentation of accidents. (Jt. Ex. 10). Also on October 20,

---

7. In the beginning of 2005, Fletcher was Director of Administration, or Administrative Manager. Later in 2005, Fletcher was assigned the position of Safety Manager.

2005, Stevens again met with Eady to discuss his progress on his 90 day PIP and gave Eady a memorandum dated October 20, 2005, which outlined deficiencies in Eady's job performance. (Stevens Aff. ¶ 63; Jt. Ex. 11). According to the memorandum, there were two accidents in August that Eady had not properly investigated and the paperwork had not been completed. Second, Stevens was not aware that the plaintiff had planned to take vacation days after she had asked him not to *do* so. Third, Stevens discovered that the additional responsibilities that had been assigned to the plaintiff and discussed with him before his vacation had not been completed—the plaintiff had failed to post the announcement regarding the need to hire two transportation supervisors and he had failed to act upon several disciplinary actions. (Jt. Ex. 11).

Eady's 90 day PIP specifically called for additional street supervision and additional monitoring of bus drivers on the street. The PIP also required Eady to renew his third party tester certification, and post a notice for supervisors and choose two supervisors in preparation for the January 2006 start-up. (Jt. Ex. 8). The plaintiff admits that during his 90 day PIP, (1) street supervision did not increase; (2) the amount of time drivers were being monitored by supervisors did not increase; (3) the plaintiff failed to renew his third party tester certification; (4) the plaintiff did not hire two supervisors; and (5) no one applied for the supervisor positions. (JFB ¶¶ 100–102).

On November 22, 2005, Stevens met with Eady to discuss his 90 day PIP. (Stevens Aff. ¶ 64). On December 5, 2005, Stevens terminated Eady. (JFB ¶ 104). Stevens was the sole decision maker regarding Eady's termination. (Stevens Aff. ¶ 65). In deciding to terminate Eady, she evaluated his 2005 performance with re-gard to his assignments. (Stevens Aff. ¶ 66 and chart following).

On January 6, 2006, Stevens hired Jeff Wheatley, a Caucasian male, to replace the plaintiff as Operations Manager. (Stevens Aff. ¶ 70; JFB ¶ 105).

## II. The defendant's motion for summary judgment

The defendant has moved for summary judgment on all counts of the plaintiff's complaint. The plaintiff contends he was discriminated against on the basis of race and FMLA status because (1) he was not promoted to Assistant General Manager; (2) he was disciplined with a ninety day PIP; and (3) he was terminated. The plaintiff further alleges that the defendant wrongfully terminated his employment in violation of South Carolina public policy when he initially refused to execute an affidavit the defendant intended to use in a prior unrelated lawsuit. Lastly, the plaintiff alleges the defendant breached an implied contract of employment based upon the defendant's employee handbook.

## III. Standard of review

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id., quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Genuineness means that the evidence must cre-

ate fair doubt; wholly speculative assertions will not suffice." *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir.1991). The defendant, as the moving party, bears the initial burden of pointing to the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir.1991), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718–19, *citing Anderson v. Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505. "[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir.1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra.* Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993) *and De Leon v. Saint Joseph Hosp. Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir.1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technolo-gies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996) (citation omitted). In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). Therefore, "[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir.1995). A party must come forward with an affirmative showing more significant than conclusory and self-serving allegations in order to survive the defendant's motion for summary judgment. *White v. Boyle*, 538 F.2d 1077, 1079 (4th Cir.1976) (conclusory allegations insufficient to avoid summary judgment). Indeed, this Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993) (*quoting Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)).

## IV. Discussion

### A. Race discrimination in violation of Title VII

■ Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e–2(a)(1). A Title VII plaintiff may defeat summary judgment through one of two avenues of proof. First, a plaintiff may establish through direct or circumstantial evidence that race or gender was a "motivating factor" in the adverse employment action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004) (en banc). Second, a plaintiff may proceed under the

"burden-shifting framework" adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hill,* 354 F.3d at 285, 298.

■ The plaintiff has elected to proceed under the three-step *McDonnell Douglas* test. (Pl. Amended Response (Docket # 64) at 2). Accordingly, the plaintiff first must present enough evidence to prove a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was taken against the plaintiff "for a legitimate, nondiscriminatory reason." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097, *citing Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This burden is one of production, not persuasion, and it "can involve no credibility assessment." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097, *quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "Assuming the employer meets this burden of production, 'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination vel non.'" *Hill,* 354 F.3d at 285 (*quoting Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons for taking the employment action

were not its true reasons, but rather "pretext" for unlawful discrimination. *Hill,* 354 F.3d at 285.

■ Despite these shifting burdens of production, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097, *quoting Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Thus, "[r]egardless of the type of evidence offered by a plaintiff as support for [his] discrimination claim (direct, circumstantial, or evidence of pretext), … [t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill,* 354 F.3d at 286 (internal quotation marks omitted).

### 1. Failure to promote

The plaintiff claims he did not receive the promised promotion to Assistant General Manager because of his race.[8] (Compl. ¶ 61; Eady Aff. ¶ 20). More specifically, the plaintiff alleges that Stevens promised him the promotion to Assistant General Manager along with Bonner, a Caucasian; that the plaintiff was qualified for the position and that Stevens denied the promotion to the plaintiff; that Bonner, the Caucasian, received the promotion; and that plaintiff was more qualified for the promotion than Bonner. (Compl.¶¶ 61(a)(e)).

■ To establish a prima facie case of discriminatory failure to promote, the plaintiff must establish that: (I) he is a member of a protected class; (2) he ap-

---

**8.** The plaintiff alleged in his complaint that he complied with the procedural filing requirements preceding the filing of a Title VII action. Specifically, the plaintiff contends that a timely charge of discrimination was filed with the Equal Employment Opportunity Commission; the plaintiff received a Notice of Right to Sue, and the complaint was filed within ninety days after receipt of the Notice of Right to Sue. (Compl.¶ 10). The defendant does not challenge these statements.

plied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Anderson v. Westinghouse Savannah River Company,* 406 F.3d 248, 268 (4th Cir.2005).

■ It is undisputed that Eady is a member of a protected class (African–American). However, as to the second part of the test, Eady did not apply for any position. Thus, he has failed to meet the second criteria for establishment of his prima facie case.

■ The Court is mindful that the exact standard to be used in establishing a prima facie case is flexible depending on the factual situation and the claim alleged. *Ennis v. National Ass'n of Business and Educational Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995). In this case, both the plaintiff and the defendant have considered the facts of this case using the disparate treatment paradigm of analysis. (Def. Mem. (Docket #52–2) at 4; Pl. Amended Response (Docket #64) at 2). To establish a prima facie case of disparate treatment, the plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his job and his performance was satisfactory; (3) despite his qualifications he suffered an adverse employment action; and (4) other employees outside the protected class were treated more favorably. *Love–Lane v. Martin,* 355 F.3d 766, 787 (4th Cir.2004).

■ With respect to establishing disparate treatment, the plaintiff must show he was qualified for his job and that his performance was satisfactory. The plaintiff contends he was fulfilling his job duties in a manner satisfactory to the defendant at

the time he was terminated, and refers this Court to his "many years" of acceptable job evaluations and his award in 2003 for Supervisor of the Year as evidence of satisfactory job performance.[9] (Pl. Amended Response (Docket #64) at 3–5). In support of his argument, the plaintiff relies on *Siraj v. Hermitage in Northern VA,* 51 Fed.Appx. 102 (4th Cir.2002). In *Siraj,* the Court found plaintiff's job performance was satisfactory because she was terminated after receiving exemplary evaluations and a substantial pay raise three months before her termination. More importantly, before her termination, the plaintiff was never given any notice that her job performance was unsatisfactory. *Siraj,* 51 Fed.Appx. at 110. The defendant argues that *Siraj* is not controlling in the present case because Eady had been put on notice that Stevens had concerns about his job performance on May 26, 2005, about five months prior to his termination. (Stevens ¶ Aff. 43, Eady Dep. 104–107).

Indeed, in May 2005, during the time the plaintiff was on FMLA leave, Stevens discovered the "Action Steps" and "Action Items" assigned to Plaintiff in December 2004 and early March 2005 had not been completed. (Stevens Aff. ¶ 31). Stevens also discovered that the plaintiff had failed to accomplish tasks that she had personally assigned him to perform prior to the first start-up. (Stevens Aff. ¶¶ 24, 31).

The plaintiff argues that he was performing all of the tasks assigned to him as Operations Manager, as well as additional tasks assigned to him during the reinstatement of employees, and that he "had no indication that his performance was unsatisfactory to Ms. Stevens between 1999

---

9. Throughout his employment, Eady never received a below expectations evaluation. (Eady Aff. ¶ 3). At the end of 2003, Stevens presented Eady with the award for Supervisor

of the Year. (Eady Aff. ¶ 4). Eady's 2004 evaluation was "met expectations." (Eady Aff. ¶ 3; Jt. Ex. 2).

when he became the Operations Manager and May 26, 2005, when he learned that he had not received the promotion to Assistant General Manager." (Pl. Amended Response at 4, *citing* Eady Aff. ¶ 8). The plaintiff's claims, however, are not supported by the evidence in the record. In December 2004 Stevens met with Plaintiff to discuss his annual review. (Stevens Aff. ¶ 15). During this December 2004 meeting, Stevens gave the plaintiff a copy of his 2004 evaluation. (Stevens Aff. ¶ 15). In this evaluation, Stevens listed her expectations for Plaintiff and his department for 2005 in the form of "Action Steps." Stevens discussed these Action Steps with Eady during the meeting. (Stevens Aff. ¶ 17), Stevens had created the 2005 Action Steps in late 2004 in anticipation of the expected June 2005 start-up, which was to include the hiring of approximately sixty-five additional employees in the Operations Department. (Stevens Aff. ¶ 16). The Action Steps set forth in the plaintiff's 2004 evaluation were designed to make the Operations Department better and ensure a successful start-up in June 2005. (Stevens Aff. ¶ 16).

As mentioned previously, in March 2005, ATC's corporate office sent Leslie Systma to assist the Charleston facility with its June 2005 start-up, and Systma created the CARTA Project List, which contained "Action Items" for each employee, including the plaintiff, to accomplish prior to and as part of the June 2005 start-up. (Stevens Aff. ¶¶ 18–20). The CARTA Project List, including Action Items for the plaintiff to complete, was distributed to him, as well as to other employees, in early March 2005. (Stevens Aff. ¶ 21). By May 2005, it was apparent to Stevens that the plaintiff was not performing the job responsibilities and duties of an Operations Manager. (Stevens Aff. ¶ 35). Stevens had discovered that at the time the plaintiff took FMLA leave on April 29, 2005, he had less than two days to meet the May 1 deadline

for developing a training program for new trainees and a training program for new hires, and less than one month to obtain the Naval Base for training and recall drivers. (Stevens Aff. ¶ 33). These facts caused Stevens to reconsider whether she wanted to give him that title. (Stevens Aff. ¶ 36). In the present case, the plaintiff has not shown that his job performance was satisfactory to his employer.

■ Even if the plaintiff were able to show a genuine issue of material fact regarding whether his job performance was satisfactory, he cannot show that the defendant's decision not to change his job title from Director of Operations to AGM/Director of Operations is an adverse employment action.

■ To show a violation of Title VII, "a plaintiff must establish that an adverse employment action has occurred." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985). An "adverse employment action" within the meaning of *McDonnell Douglas* is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). In *Page v. Bolger*, 645 F.2d 227 (4th Cir.1981) (en banc), the Fourth Circuit examined the question of what constitutes "adverse employment action" and stated that inquiries "consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions

such as hiring, granting leave, discharging, promoting and compensation." *Id.* at 233.

The plaintiff contends that he suffered an adverse employment action when the defendant failed to promote him, relying upon *Boone v. Goldin,* 178 F.3d 253 (4th Cir.1999), for the proposition that an adverse action includes a "decrease in compensation [or] job title[.]" (Pl. Amended Response 6, citing *Boone v. Goldin,* 178 F.3d at 256–57). However, the Court finds that the facts at bar do not compel the conclusion that the plaintiff suffered a "decrease" in job title—he simply retained the same job title as before the organizational chart was finalized on May 26, 2005. Indeed, *Boone v. Goldin* is inapplicable to the case at bar, as it teaches that an "adverse employment action" that would support a Title VII claim includes "discharge, demotion, decrease in pay or benefits, *loss of job title* or supervisory responsibility, or reduced opportunities for promotion." *Id.,* 178 F.3d at 255 (emphasis added). Here, the plaintiff did not lose his job title, but retained the same title he had before the organizational chart was finalized. The evidence does not support the plaintiff's claim that he suffered an adverse employment action when his title was not changed.

Furthermore, when Stevens met with the plaintiff and showed him the proposed organizational chart, Stevens did not tell plaintiff that he was being promoted, or that he would receive additional pay, or additional job duties or responsibilities as a result of his title being changed from Director of Operations to AGM/Director of Operations. (Eady Dep. 70; Stevens Aff. ¶ 28). The only difference between the proposed organizational chart and the final version of the organizational chart was that the plaintiff's job title had not been changed. (Eady Dep. 98; Stevens Aff. ¶ 39). It is undisputed that the plaintiff did not have any change in his salary,

benefits, job responsibilities, or duties as a result of his job title not being changed from Director of Operations to AGM/Director of Operations. (Eady Dep. 105–106; Stevens Aff. ¶ 39). After Bonner's job title was changed from Director of Maintenance to AGM/Director of Maintenance, Bonner did not receive an increase in salary or benefits, and his job duties and responsibilities did not change. (Bonner Dep. 16–17; Stevens Aff. 40). Bonner never was told he would receive a raise in salary after his job title changed and he did not expect a raise. (Bonner Dep. 16). Bonner's job duties did not change in any way as the AGM/Director of Maintenance. (Bonner Dep. 16). Furthermore, there were not separate job descriptions for Assistant General Manager/Maintenance Director or Assistant General Manager/Operations Manager. (Stevens Aff. ¶ 41; Eady Dep. 73).

The plaintiff has not produced any evidence he would have received additional money, benefits, Job duties, or responsibilities if he received the title AGM/Director of Operations. The plaintiff cannot establish that the defendant's decision not to change his title from Operations Director to Assistant General Manager/Operations Director was an adverse employment action.

### 2. The 90 day PIP

Next, the plaintiff claims that "[t]he amount of additional tasks, scrutiny, and unfavorable treatment involved in this 90–day [PTP] show that this disciplinary action was an adverse employment action." (Pl. Amended Response at 6). In support of this argument, the plaintiff refers this Court to *Burlington N. & Sante Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), without further explication. The Court's review of that case does not support the plaintiff's claim. In

*White,* the Supreme Court addressed what is required at the second step of a plaintiff's prima facie case in the context of retaliation. To establish a prima facie case of retaliation in violation of Title VII, an employee must show: "(1) that he engaged in a protected activity; (2) that he suffered a materially adverse action, that is, an action which well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,' and (3) that there is a causal connection between the protected activity and the materially adverse action." *White,* 548 U.S. at 68, 126 S.Ct. 2405. This case is not applicable to the facts at bar, as the plaintiff has not alleged that he was retaliated against for engaging in a protected activity.[10]

Contrary to the plaintiff's contention, the Court does not find that the defendant's issuance of the PIP to the plaintiff was an "adverse employment action" because there is no evidence that it caused any change whatsoever in plaintiff's job, pay, or benefits or in his employment status. *See, e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257.

### 3. The plaintiffs termination

Next, the plaintiff alleges that his termination from employment was an adverse employment action. (Pl. Amended Response at 6). The Court agrees. Nevertheless, as discussed earlier, the plaintiff cannot show that he was meeting the defendant's legitimate job expectations.

On May 26, 2005, Eady saw the final version of the organizational chart posted by Stevens and called her to ask why she did not change his title to AGM/Director of Operations. (Eady Dep. 98; Stevens Aff. ¶ 43). Eady admits that Stevens told him that she was not going to change his title

because she was dissatisfied with his job performance. (Eady Dep. 104–107; Stevens Aff. ¶ 43). The plaintiff was aware that he had been assigned "Action Steps" and "Action Items" in December 2004 and early March 2005. In June 2005, Stevens received a complaint from Howard Chapman, Executive Director of CARTA with respect to the plaintiff. (Stevens Aff. ¶ 45). The plaintiff has admitted that during his 90 day PIP, (1) street supervision did not increase; (2) the amount of time drivers were being monitored by supervisors did not increase; (3) the plaintiff failed to renew his third party tester certification; (4) the plaintiff did not hire two supervisors, and no one applied for the supervisor positions. (JFB ¶¶ 100–102). Based on these facts, the plaintiff cannot be said to have been meeting his employer's legitimate job expectations.

 "Title VII of the Civil Rights Act ... does not prohibit an employer from taking adverse action against an employee which is justified by a legitimate business reason." *Proctor v. State Govt. of North Carolina,* 689 F.2d 491, 494 (4th Cir.1982), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff has failed to prove a prima facie case of race discrimination.

### B. Discrimination in violation of the FMLA

Under the FMLA, an eligible employee suffering from a serious health condition is entitled to 12 workweeks of leave during any 32–month period. 29 U.S.C. § 2612(a)(1). Under the FMLA, it is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any rights asserted

---

**10.** An employee has engaged in protected activity when he has (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

pursuant to that statute. 29 U.S.C. § 2615.

The plaintiff contends that the defendant's decision to deny him the promotion, place him on a ninety day PIP, and ultimately terminate his employment were all a direct result or were substantially motivated by the plaintiff taking FMLA leave. (Compl. ¶ 81; Eady Aff. ¶ 19).

■■■■ Alleged retaliation against employees for exercise of their FMLA rights is analyzed under the same burden-shifting framework that applies in Title VII retaliatory discharge cases. *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir.2001); *Dodgens v. Kent Mfg. Co.*, 955 F.Supp. 560, 566 (D.S.C.1997). Under that analysis, the plaintiff must first establish a prima facie case of retaliation. Thus, the plaintiff must show by the preponderance of the evidence: (1) he took FMLA leave; (2) he suffered an adverse employment action; (3) the adverse employment action was causally related to the plaintiffs FMLA leave. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir.2006).

■■■ Upon establishing a prima facie case, the burden shifts to the defendant-employer to show that there was a "legitimate, non-retaliatory reason for the action." Once the defendant has shown there was a legitimate reason for the action, the plaintiff must then provide evidence to show that the defendant acted with retaliatory pretext. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir.2004).

■■■ As discussed above, although the plaintiff can show that he took FMLA leave, he cannot show that he suffered an adverse employment action because of taking the leave. With respect to the job title issue, the plaintiffs poor job performance occurred prior to the FMLA leave, and this poor job performance resulted in him not receiving the AGM job title. Indeed,

Stevens testified that one of the reasons she decided not to change the plaintiff's title from Director of Operations to AGM/Director of Operations was because *the plaintiff* failed to secure the Naval Base for training prior to his FMLA leave. (Stevens Aff. ¶¶ 31–32, 43).

Turning to the plaintiffs termination as an adverse employment action, Stevens told the plaintiff on May 26, 2005 that his performance *prior to* his FMLA leave was unacceptable. (Eady Dep. 127–28). Specifically, Stevens discovered that the plaintiff had (I) failed to reserve the old Naval Base as a site to conduct training; (2) failed to interview and hire new employees and supervisors, and (3) failed to develop and implement a written plan on how to train all employees. (Stevens Aff. ¶¶ 31–32). With respect to reserving the old Naval Base, Stevens specifically assigned that responsibility to the plaintiff. The plaintiff testified that he did not make these arrangements, but asked another employee, Harry Burwell, to do so. (Eady Dep. 199–200). Burnell was still waiting for paperwork to reserve the Naval Base during Eady's FMLA leave, (Eady Dep. 200–201).

The plaintiff also failed to interview and hire new employees and supervisors. Although the plaintiff contends that company policy would not allow him to hire new employees thirty days in advance of employment, it remains that the plaintiff has not produced any evidence that he interviewed any applicants for hiring into those positions.

Finally, as Stevens discovered, when the plaintiff took FMLA leave on April 29, 2005, he had only two days (until the May 1, 2005 deadline) to complete items 17 and 18 listed in the CARTA Project List, which were to "Develop a training program for new trainees" and "[p]repare a training program for recalled drivers/mechanics,"

Although the plaintiff argues in his Response that he developed a written plan for training (Pl. Amended Response (Docket # 64) at 22), this claim contradicts his previous deposition testimony in which he admitted that he did not develop, and was not responsible for developing, a written plan for training, (Eady Dep. 174).

■ The plaintiff has produced no credible evidence that his FMLA status (or his race) affected the defendant's decision to terminate him. When asked during his deposition if he had any facts or evidence that would establish his placement in the 90 day PIP and termination were based on race or his FMLA status, the plaintiff stated, "no," and explained that it was just his "belief" that he was placed in a 90 day PIP and terminated due to those factors. (Eady Dep. 130–135). As the Fourth Circuit Court of Appeals has observed; "Unquestionably, when a plaintiff admits under oath that he or she cannot point to any statement or piece of physical evidence indicative of [race or FMLA] discrimination, it undermines the plaintiff's claim that but for [race or FMLA status] the employment decision would not have been made." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992). The plaintiff has failed to set forth a prima facie case of discrimination under the FMLA.

## C. Wrongful termination in violation of public policy

■ The plaintiff also has alleged wrongful termination in violation of public policy, based upon his initial refusal to sign a blank signature page for an affidavit that was prepared for his signature with regard to an earlier, unrelated lawsuit brought by a former ATC employee against the defendant. As discussed more fully below, after Eady requested changes to the affidavit and those changes were made, Eady signed the affidavit on or about June 24, 2005. (Eady Dep. 296, Eady Aff. ¶ 41). The plaintiff contends that his termination was in retaliation for refusing, at first, to sign the affidavit (Eady Dep. 297), and, the plaintiff contends in retrospect that Stevens put him on the 90 day PIP in retaliation for his initial refusal to sign the affidavit. (Eady Aff. ¶ 41). When asked whether he had any facts or evidence to support his theory that his termination had anything to do with the affidavit which he signed, the plaintiff responded: "I don't have nothing to support it. It's just what I believe." (Eady Dep. 297).

The parties have agreed on the following facts surrounding the plaintiff's execution of the signature page of the affidavit: Harry Fyall, former Lead Supervisor and Dispatcher employed by ATC, filed a lawsuit against ATC in a case styled *Harry Fyall v. ATC/Vancom, et al,* Case No. 2:04–23086–12AJ. ATC prepared an affidavit for Eady's signature to use in support of its Motion for Summary Judgment in the *Fyall* case. Stevens delivered the signature page of the affidavit to Eady for his review and signature. Eady took the signature page of the affidavit to a bank and had his signature notarized but did not immediately return the signature page of the affidavit to ATC. Eady called someone at ATC's corporate office and asked to see the rest of the affidavit. ATC's corporate office sent Eady the rest of the affidavit. Eady reviewed the affidavit and did not agree with all of it and revised the affidavit with a highlighter. Eady then asked ATC's corporate office to make the revisions he had suggested. ATC's corporate office made all the changes Eady requested. Eady attached the executed signature page to the affidavit and returned the completed document to ATC. The completed, executed affidavit reflected all the changes Eady requested. (JFB ¶¶ 109–119).

The plaintiff argues, without citation to any legal authority, that "[c]oercion of employees to execute an unknown and unread affidavit must be against public policy. Retaliatory termination for refusing to sign a false affidavit must also be against public policy." (Pl. Amended Response (Docket # 64) at 35). As a threshold matter, the undisputed facts do not provide any evidence of coercion, which is defined as "[c]ompelling something by force, arms, or threats (the confession was obtained by coercion)." West's Legal Thesaurus/Dictionary (1986). Indeed, as the plaintiff testified, ATC "ma[d]e all the changes" he requested to the affidavit without any argument or comment whatsoever. (Eady Dep. 289). Furthermore, although the plaintiff claims in his affidavit that Stevens became angry with him after he discussed the errors in the affidavit with her (Eady Aff. ¶ 40), this claim is belied by his earlier deposition testimony, wherein he stated that after his discussion with Stevens about correcting the affidavit, "[W]hether or not she was upset about it, I really didn't see. She walked out of my office and that was it." (Eady Dep. 290).

The South Carolina Supreme Court has recognized a public policy exception to the employment at-will doctrine, and has held that "[w]here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." *Greene v. Quest Diagnostics Clinical Laboratories, Inc.*, 455 F.Supp.2d 483, 489 (D.S.C.2006) (*citing Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 224–25, 337 S.E.2d 213, 216 (1985)). The *Ludwick* court specified at least two situations in which an employee can be wrongfully discharged in violation of public

policy: (1) when an employer requires an employee to violate a criminal law as a condition of maintaining employment, and (2) when the act of terminating an employee is itself in violation of criminal law. *Greene*, 455 F.Supp.2d at 489 (citing *Ludwick*, 287 S.C. at 221–25, 337 S.E.2d at 214–16, *and Culler v. Blue Ridge Elec. Coop., Inc.*, 309 S.C. 243, 246, 422 S.E.2d 91, 92–93 (1992)). In *Greene*, the plaintiff contended that the public policy exception should be extended to apply to her termination, which occurred after she internally reported a crime committed within the company. The District Court disagreed, holding that her claim did not fit within the currently recognized bounds· of the public policy exception. *Greene*, 455 F.Supp.2d at 489.

Here, the plaintiff offers no argument whatsoever as to how the defendant's alleged actions could be in violation of the "clear mandate of public policy" required by *Ludwick*. As in *Greene*, because the plaintiff has not alleged that he. was required to violate a criminal law or that his termination was in violation of a criminal law, his claim does not fall within the public policy exception and summary judgment is granted to the defendant on the plaintiffs claim for wrongful termination in violation of public policy.[11]

### D. The breach of contract action based upon the Administrative Employee Handbook

The parties agree that the defendant's Administrative Employee Handbook, effective January 1, 1999, and its addendum dated December 1, 2002 (the "Handbook") were in effect in 2005. (*See* Jt. Ex. 17).

▮▮▮ Eady contends that the Handbook and its policies created an implied contract

---

11. As the defendant notes, the plaintiff's affidavit ultimately permitted the defendant to succeed in the *Fyall* action. It is not logical to conclude that the defendant would termi-

nate the plaintiff's employment because plaintiff assisted in the defendant's defense of that action.

of employment between him and the defendant, that he performed under the terms of the Handbook, and that the defendant has breached the contract by wrongfully terminating his employment. The plaintiff further contends that the defendant's actions were in violation of public policy. (Compl. [1] at ¶¶ 93–99).

Under South Carolina law, "[a]t-will employment is generally terminable by either party at any time, for any reason or for no reason at all." *Prescott v. Farmers Tel. Coop., Inc.*, 335 S.C. 330, 334, 516 S.E.2d 923, 925 (1999). However, when an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract. *Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606, 610 (2002). The plaintiff contends that whether the Handbook is an employment contract is a question of fact. This argument is without merit.

The Introduction to the Handbook states in pertinent part:

> The policies in this manual are not a contractual relationship between the [defendant] and its employees or a promise of continued employment with [the defendant]. We are an "at will" employer, which means that both you and the [defendant] can terminate the employment relationship at any time for any reason not expressly prohibited by law. It is the policy of [the defendant] that all employees are employed at the will of the [defendant] for an indefinite period.

(Jt. Ex. 17 at 6).

The Handbook also contains the following recitation:

ATC has established and adopted an Equal Employment Opportunity and Affirmative Action Policy. The purpose of this policy is to ensure that all employment decisions are made on a non-discriminatory basis, and without regard to a qualified employee's or applicant's race, color, religion, gender, national origin, age, marital or veteran status, the presence of a non-job-related medical condition or disability, Vietnam Era Veteran, or any other legally protected status.

This Court previously has held that the defendant's non-discrimination policy "does not constitute a promise altering the at-will employment relationship and giving rise to a breach-of-contract claim." *Fyall v. ATC/Ancon of South Carolina, L.P and Nat'l Express Corp.*, No 2:04–23086–CWH, 2005 WL 2656962 (D.S.C. October 18, 2005), (*citing Hessenthaler v. Tri–County Sister Help, Inc.*, 365 S.C. 101, 110, 616 S.E.2d 694, 698 (2005) *in turn citing McKenzie v. Lunds, Inc.*, 63 F.Supp.2d 986, 1003 (D.Minn.1999) *and Cherella v. Phoenix Technologies Ltd.*, 32 Mass.App. Ct. 919, 586 N.E.2d 29, 31 (1992)). The non-discrimination language in the defendant's Handbook will not sustain the plaintiff's cause of action for breach of contract. *Hessenthaler*, 365 S.C., at 110, 616 S.E.2d at 698.

With respect to his cause of action for breach of contract, the plaintiff alleged in his deposition that the defendant violated the section entitled Progressive Corrective Action, regarding progressive discipline, contained on pages 46, 47, and 48 of the Handbook.[12] The plaintiff, however, makes no argument to this Court as to how the defendant violated this portion of the Handbook. The failure of a party to

---

12. This portion of the Handbook provides that while some instances of improper conduct or violations of policies and rules can be correctable, other improper conduct or violations of policies and rules is grounds for immediate termination; the Handbook also sets forth specific offenses that will result in termination.

address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action. *Jones v. Danek Medical, Inc.,* 1999 WL 1133272 at *3 (D.S.C. October 12, 1999), *citing Wood County Airport Auth. v. Crown Airways, Inc.,* 919 F.Supp. 960, 964 & n. 9 (S.D.W.Va.1996).

Finally, the plaintiff contends for the first time in his amended response to the defendant's memorandum in support of summary judgment (Docket # 64) that the defendant also violated the following Handbook policies: Standards of Conduct, ¶ 11–12; Open Door Policy, p. 13; Job Opportunities, p. 18; Courteous Conduct, p. 28; Medical Leave, p. 51; Vacation, p. 56; Family and Medical Leave, p. 58–59, and Equal Employment Opportunity and Affirmative Action Policy, p. 65–66. (Jt. Ex. 17). The Court will decline to address these arguments, as they are raised for the first time in the plaintiff's amended response. Likewise, the plaintiff's claim that the Handbook fails to contain a conspicuous disclaimer as provided in S.C.Code Ann. § 41–1–110 is set forth for the first time in his amended response and will not be addressed by the Court.

## V. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is granted, and the defendant's motion to strike the plaintiff's expert designation is moot.[13]

**IT IS SO ORDERED.**

---

**13.** Also pending before the Court was the defendant's motion to strike the plaintiffs expert witness designation (Docket # 60). The plaintiff had identified a certified public accountant as an expert witness who would testify at trial as to the value of the financial loss suffered by the plaintiff as a result of his alleged wrongful termination, As the Court has granted summary judgment to the defendant on all of the plaintiff's causes of action, the Court need not hear this motion.